## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                       Plaintiff,<br><br>    v.<br><br>CLS GLOBAL FZC LLC and<br>ANDREY ZHORZHES,<br><br>                 Defendants. | Civil Action No. 24-CV-____(___)<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission" or "SEC"), alleges the following against the defendants, CLS Global FZC LLC ("CLS Global") and Andrey Zhorzhes:

## SUMMARY

1.       CLS Global claims on its website that it provides its clients, typically the offerors of crypto assets, with "market making" services that "leverage[] robust trading algorithms" and a "team of specialized experts" to "devise . . . effective trading strateg[ies]" for crypto assets.

2.       What CLS Global in fact provides is on-demand market manipulation.  For a monthly fee, CLS Global engages in manipulative trading of its clients' crypto assets to artificially inflate their price and trading volume.  CLS Global does this for the express purpose of misleading investors to believe that there is a robust market for these crypto assets, when there is often little or no genuine interest in them.  That fake trading volume is reported on websites that the investing public consults when deciding which crypto assets to buy and sell, and which trading platforms to buy and sell them on.

3.      CLS Global manipulates the markets for its clients' assets either by engaging in extensive wash trading or through other types of purchases and sales that likewise serve no economic purpose.  While the manner of manipulative trading varies depending on the type of trading platform used for the manipulation, the transactions are all expressly designed to create the false impression of market interest in the tokens that they trade.

4.      Defendant Zhorzhes, a business development manager for CLS Global, pitches this market manipulation to prospective clients.  He has described CLS Global's market manipulation as "self-trad[ing]" and "wash trading."  He has touted CLS Global's ability to make its manipulation "not visible" to the investing public, and instead to make it appear "like some organic buying and selling is happening."  And he has stated that the purpose of CLS Global's manipulative trading is to get "people . . . interested in trading" its clients' crypto assets.

5.      In or around June 2024, Zhorzhes began to discuss a potential engagement with a group of individuals he believed to be promoters of a crypto asset project called NexFundAI.  Zhorzhes learned that the NexFundAI project team wanted to hire CLS Global to generate artificial trading volume for the purpose of increasing interest in NexFundAI.  Zhorzhes said that CLS Global could assist the NexFundAI project team with "volume creation" and detailed how CLS Global would execute "self-trades" to create the impression of a robust market for NexFundAI and induce others to buy it.

6.      CLS Global and Zhorzhes were unaware that NexFundAI and its promotional materials had been developed at the direction of the Federal Bureau of Investigation ("FBI") as a part of its undercover investigation of crypto asset market manipulation.

7.      Zhorzhes's discussions with the NexFundAI project team ultimately led to an agreement by CLS Global to manipulate NexFundAI's trading volume in exchange for a

monthly fee of $4,000 in the crypto asset Tether.  Pursuant to that agreement and related

discussions, between August 23, 2024, and September 18, 2024, CLS Global traded NexFundAI

on the Uniswap trading platform, generating over half a million dollars in artificial trading

volume.  During that period, CLS Global's manipulative trades accounted for 98% of

NexFundAI's total trading volume.

8.      Defendants' conduct has caused significant harm—to the integrity of the markets

and to the investor victims who traded in crypto assets fraudulently lured by the fake volumes

and prices that CLS Global manufactured.  This conduct is ongoing and will continue unless

Defendants are permanently enjoined.

## VIOLATIONS

9.      As a result of the conduct alleged herein, Defendants violated, and unless

restrained and enjoined will continue to violate, Sections 17(a)(1), and 17(a)(3) of the Securities

Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)], Sections 9(a)(2) and

10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78i(a)(2) and

78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

## RELIEF SOUGHT

10.     The Commission seeks permanent injunctions against Defendants; disgorgement

of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with

prejudgment interest pursuant to Section 21(d)(5) and (7) of the Exchange Act [15 U.S.C.

§§ 78u(d)(5) and (7)]; civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C.

§ 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and an order

prohibiting Defendants from participating, directly or indirectly, in any issuance, purchase, offer,

or sale of any securities, provided, however, that such injunction shall not prevent Defendant

Zhorzhes from purchasing or selling securities for his personal account; and such other relief as the Court may deem appropriate

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

12.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the District of Massachusetts, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails. Communications in furtherance of the scheme were made to and from the District.

## DEFENDANTS

13.     **CLS Global FZC LLC** is a free zone company incorporated under the laws of the United Arab Emirates.  CLS Global is believed to be based in Dubai, United Arab Emirates. CLS Global claims to provide various services for crypto asset projects, including marketing, consulting, and purported "market making."

14.     **Andrey Zhorzhes** has at all relevant times held himself out to be CLS Global's Middle East and North America Lead and Senior Business Development Manager.  Zhorzhes is believed to reside in Dubai, United Arab Emirates.

## RELATED INDIVIDUALS

15.     An individual who identifies himself in private chats on the encrypted messaging platform Telegram as "Vlad | CLS" works for CLS Global.

16.     An individual who identifies herself on Telegram as "Maria | CLS" works for CLS Global.

## REGULATORY BACKGROUND

17.     As the Supreme Court has recently reemphasized, the Securities Act and the Exchange Act "form the backbone of American securities law." *Slack Tech., LLC v. Pirani*, 598 U.S. 759, 762 (2023).  Together, these Acts provide for the regulation of various activities in the markets for securities and define "security" broadly to include a wide range of assets, including "investment contracts."  Securities Act § 2(a)(1) [15 U.S.C. § 77b(a)(1)]; Exchange Act § 3(a)(10) [15 U.S.C. § 78c(a)(10)].

18.     Congress enacted the Exchange Act in part to provide for the regulation of the national securities markets.  Congress created the SEC and charged it with protecting investors, preserving fair and orderly markets, and facilitating capital formation.  In keeping with Congress' goals, these Acts contain broad anti-fraud and anti-manipulation prohibitions.

19.     Over seventy years ago, the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), set forth the relevant test for determining whether an instrument is an investment contract subject to regulation under U.S. securities laws.

20.     Investment contracts are transactions, contracts, or schemes through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others.

21.     Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  *Id.* at 299.

## BACKGROUND ON CRYPTO ASSETS

22.     As used herein, the terms "crypto asset" or "token" generally refer to an asset issued and/or transferred using blockchain or distributed ledger technology, including assets referred to colloquially as a "digital asset," "cryptocurrency," "virtual currency," and digital "coin."

23.     A blockchain or distributed ledger is a database spread across a network of computers that records all transactions in theoretically unchangeable, digitally recorded data packages, referred to as "blocks."  The system relies on cryptographic techniques for secure recording of transactions.

24.     The Ethereum blockchain is an example of a blockchain.  Ether (or "ETH") is the Ethereum blockchain's native token.  (Some crypto assets may be "native tokens" to a particular blockchain—meaning that they are represented on their own blockchain, though other crypto assets may also be represented on that same blockchain, as is the case with the Ethereum blockchain.)

25.     ERC-20 is a standard protocol (or technical specification of the type of crypto token) currently used on the Ethereum blockchain to create and represent tokens on that blockchain.

26.     A crypto asset "wallet" is hardware or software that enables users to store private keys, which function like passwords that are used to access and transfer crypto assets.

27.     Crypto asset trading platforms allow their customers to purchase and sell crypto assets for fiat currency (legal tender issued by a country) or for other crypto assets, depending on the platform.  "Off-chain" transactions are tracked in the internal recordkeeping mechanisms of the platform but do not involve transferring crypto assets from one wallet to another, while "on-

chain" transactions are those involving the transfer of a crypto asset from one blockchain address to another.

28.     On July 25, 2017, the SEC issued the *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934:  The DAO*, advising "those who would use . . . distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws," and finding that the offering of crypto assets at issue in that report involved investment contracts and thus securities.

## BACKGROUND ON MARKET MAKERS

29.     "Market makers" are in the business of buying securities from those who wish to sell, and selling securities to those who wish to buy, and operate in many traditional securities markets.  Market makers "make markets" by continuously and publicly quoting both a price at which they are willing to buy a security (the "bid") and a higher price at which they are willing to sell the security (the "ask").  The difference between these prices is known as the "bid-ask spread," (or just "the spread") and is one of the ways market makers earn money through both buying and selling—i.e., "making a market" for—securities.

30.     Market makers can affect the liquidity, depth, and efficiency of markets by ensuring that there is always a counterparty willing to transact with buyers and sellers at publicly quoted prices.  This is especially the case for thinly traded securities, where there may be few "natural" (or "organic") buyers and sellers in the market.  A market maker can provide liquidity to a seller of a security when it is difficult to find a natural buyer, or to a buyer of a security when it is difficult to find a natural seller.

31.     In traditional securities markets, trading platforms such as national securities exchanges frequently offer incentives for market makers to provide real liquidity to traders on

the platform, even for illiquid securities and during periods of market stress.

32.     In traditional securities markets, market makers and other market participants are regulated with a view toward promoting benefits to the overall market and deterring any conflicts of interest or unfair trading advantages.  Market makers are subject to requirements regarding registration, capital, trade reporting, and business conduct standards, among other things.  By contrast, self-described market makers operating on unregistered crypto asset trading platforms do not adhere to these requirements.  In such an environment and in the absence of regulatory compliance and its concomitant oversight, market makers have ample opportunities to act on powerful incentives to manipulate a token's price and/or trading volume.

33.     For example, unlike in the traditional, regulatorily compliant markets, in the crypto asset markets it is often the token offeror who pays these market makers a monthly fee. These fees pay for services that may include artificially inflating trading volumes to create the false impression that there is a robust market for what is in reality a thinly traded crypto asset.  A market maker might accomplish this by using one or more accounts it directly or indirectly controls to trade against its own quotation.  Here, there is no change in beneficial ownership of the asset traded, but the trade creates the appearance of a market-driven transaction.  This phenomenon is known as "wash trading."

34.     Similarly, the token offeror might seek to have one or more market makers create artificial volume to meet minimum requirements for having their crypto asset made available on one or more crypto asset trading platforms.  This could give the crypto asset greater prominence and potentially attract more natural buyers and sellers.

35.     Manipulative trading can benefit both the offeror and the market maker at the expense of natural investors.  Each has incentives to generate public interest in the token so that

they can liquidate their token supplies at higher prices—particularly if the crypto asset's offerors and their affiliates have retained large portions of the assets at inception (as is common in the crypto asset markets), which they cannot monetize absent demand from natural buyers.

## FACTS

**I.      NexFundAI Was Offered and Sold as a Security.**

36.      In 2024, the NexFundAI crypto asset, along with related promotional materials on a publicly available website, was created at the direction of the FBI.  NexFundAI is an ERC-20 standard token on the Ethereum blockchain.

37.      As described on its website, the NexFundAI token was a vehicle to invest in "early-stage AI projects, generating returns distributed back to . . . token holders."  More specifically, the website explained that an experienced development team would identify early-stage companies and crypto projects involving artificial intelligence and would invest proceeds from the sales of NexFundAI tokens in these projects.

38.      According to the NexFundAI website, investors in NexFundAI were supposedly entitled to a share of any profits generated by the investments in these projects, as well as a share of the fees generated from NexFundAI transactions, all in proportion to their NexFundAI holdings.

39.      Beginning in or about May 2024, NexFundAI was offered and sold to the public on a crypto asset trading platform.

40.      Moreover, NexFundAI was offered and sold as a security.

41.      *First*, NexFundAI purchasers, including those who bought it on crypto asset trading platforms, invested money—specifically U.S. dollars, Bitcoin, or ETH—when they purchased NexFundAI.

42.     *Second*, NexFundAI purchasers invested in a common enterprise.  Because the value of NexFundAI rose or fell together and equally for all holders, all NexFundAI holders profited or suffered losses equally in amounts proportionate to their NexFundAI holdings.  As such, each NexFundAI investor's financial fortunes—including the realization of future profits—were inextricably tied together.

43.     Further, according to the NexFundAI website, 25 percent of the initial supply of NexFundAI was allocated to an "investment wallet," which would be used to fund investments with the goal of generating profits for all NexFundAI investors.  Thereafter, for each NexFundAI on-chain transaction conducted on the blockchain, one percent of the value of the transaction was distributed to and pooled in the investment wallet, such that "[e]ach transaction grows the investment fund."  The proceeds pooled in the investment wallet would be used to fund the early-stage artificial intelligence companies and crypto projects.  And "80% of profits from [these] investment projects" would be "distributed to token holders."

44.     Moreover, as the marketing materials for NexFundAI publicly explained, for each NexFundAI on-chain transaction, one percent of the value of the transaction was redistributed to NexFundAI holders in proportion to their NexFundAI holdings, and another one percent of the value of the transaction was "burned" (or destroyed), decreasing the supply of NexFundAI.[1]

45.     *Third*, NexFundAI's promotional materials led NexFundAI investors to reasonably expect that they would profit from their NexFundAI investments, based on the entrepreneurial and managerial efforts of others, including the NexFundAI project team.

---

[1]   "Burning" crypto assets refers to sending those assets to an inaccessible wallet from which the tokens cannot be withdrawn, thereby removing them from circulation.

46.     The NexFundAI website invites "AI Startups / Projects" to "contact us directly and start a discussion on your project" and potential "funding."  As described on the website, the "projects / startups" the project team identified "will be integrating with" the NexFundAI token. From the perspective of a NexFundAI investor, such integration, if it occurred, would increase the uses for—and, consequently, the number of transactions involving—NexFundAI.  Increased transactions would, in turn, generate additional transaction fees that would be redistributed proportionally back to NexFundAI holders.

47.     The NexFundAI website expressly and repeatedly described NexFundAI as an "investment" with the potential for profit.  By way of example, the website stated that NexFundAI was "an investment vehicle" that "generat[ed] returns distributed back to our token holders" and was intended to "provid[e] . . . financial returns."  Moreover, the website explained that NexFundAI also served as a source of passive income for its holders by virtue of transaction fees that generated redistributions to holders and decreased NexFundAI's available supply.

**II.     CLS Global and Zhorzhes Agreed to Manipulate NexFundAI's Trading Volume.**

48.     In or about June 2024, Zhorzhes contacted via Telegram an individual purporting to be a NexFundAI promoter.  This individual had been referred to Zhorzhes by a representative of the LBank crypto asset trading platform.  Zhorzhes stated in a private Telegram chat that CLS Global's "objective is to stimulate organic demand and attract new users and investors for token purchases."  Zhorzhes soon began communicating via Telegram group chat with several individuals purporting to be NexFundAI promoters (the "NexFundAI team").  At all relevant times, one or more members of the NexFundAI team was located in the District of Massachusetts.

49.     On or around July 3, 2024, the NexFundAI team held an initial videoconference with Zhorzhes to discuss potentially retaining CLS Global as NexFundAI's "market maker." The NexFundAI team made its purpose plain, with one member telling Zhorzhes that they wanted to hire a "market maker" to trade NexFundAI on Uniswap for the purpose of creating the appearance of "organic trading volume" and interest in NexFundAI.

50.     Zhorzhes explained ways in which he and CLS Global could assist the NexFundAI team:  "[T]he thing that we can help with is volume creation, right, so we can help with volume generation so you guys are able to meet exchange requirements if you are applying for [a] tier one exchange."  He further explained that CLS Global could assist with "token liquidation, which means that we can liquidate tokens without affecting the price, creating red candle, which we do using an algorithm that basically sells into the buys that happen on an exchange."[2]

51.     Regarding artificial volume generation on Uniswap in particular, Zhorzhes stated: "[W]e have an algo [i.e., algorithm] that basically trades.  It requires some deposits in Ethereum and in your token, and then it does basically self-trades, buying and selling, and the only expenses that you have is the gas fee and the exchange fee . . . .  [W]e do that from multiple wallets, so it's not visible like it's volume generation; it looks like some organic buying and selling is happening."[3]

---

[2]  A "candle" is a graphic snapshot of whether the market price of a security moved positively or negatively and to what degree.  The "candlestick" measures the opening and closing prices during a given timeframe, and the "wick" measures the highest and lowest prices.  A "green candle" shows that a security's market price has increased during the relevant period, whereas a "red candle" shows that a security's market price has decreased during the relevant period.

[3]  Fees that are required to conduct transactions on the Ethereum blockchain are often called "gas."  They are distinct from any additional fees imposed by a crypto asset trading platform and/or a smart contract.

52.     Zhorzhes understood that the purpose of such trading on Uniswap was, in his words, "creating some volumes . . . so the token looks organic, looks live, and people get interested in trading it."  He explained that CLS Global accomplishes that goal "by transferring the funds into multiple wallets—that could be as many as you guys wish, right, up to a thousand or something—from which we do the buying and selling . . . and generate some desired number for you.  So we decide on a number that we wish to generate per day.  It can be 100, 200, 300K, doesn't matter.  And then we generate this number . . . on a 24-hour time-frame."

53.     Zhorzhes advised the NexFundAI team that generating artificial volume on Uniswap would potentially require payment of significant fees (both "gas" and trading fees), noting that generating $200,000 in artificial trading volume might cost $30,000 in fees.  He suggested that the NexFundAI team instead "take this 30K and pay for listing on MEXC or another exchange like Bitmart, where you can make up to 60 to 100K monthly just from token liquidation."

54.     Zhorzhes explained that on these other trading platforms:  "You can generate any number with zero fees."  He acknowledged:  "I know that it's wash trading, and I know people might not be happy about it."  But, he reasoned, "it's better to spend the money you're going to spend on fees on new listings, which basically creates more FOMO."[4]

55.     Nevertheless, Zhorzhes made clear that the NexFundAI team were "the bosses," and, if they wanted to generate volume on Uniswap, CLS Global could "always do it."

---

[4]  In this context, "FOMO" or "fear of missing out" refers to investors' "fear" that they may lose out on profiting from an increase in a crypto asset's price.

56.     Zhorzhes suggested that the NexFundAI team notify CLS Global in advance of "marketing updates" and "big announcement[s]" so that CLS Global could "push the volumes a bit before" and conduct "small buybacks" to "create green candles."

57.     Toward the end of the videoconference, Zhorzhes requested email addresses to which CLS Global's "legal team" could send draft contracts.  He noted that the NexFundAI team was located in the United States and informed the team that CLS Global could not execute a contract with a U.S. person or entity "because then volume generation will be an issue."  But instead of deciding that CLS Global therefore could not serve as NexFundAI's "market maker," Zhorzhes instead asked whether the NexFundAI team could obscure its U.S. presence by finding a non-U.S. person or entity to execute the agreement.  A member of the NexFundAI team said that the NexFundAI team could "work that out" and would "create something if we have to."  Zhorzhes responded:  "OK."

58.     On July 4, 2024, an email account in the name of "CLS Legal" sent to the NexFundAI team a draft "License Agreement" that set forth the terms of the "market making" services that CLS Global proposed to provide to the NexFundAI team.

59.     Around that same time, the NexFundAI team also received a document containing CLS Global's "Market Making proposal for [NexFundAI]" (the "Proposal").  The Proposal touts CLS Global's experience ("7+ Years on the market"), client base ("500+ Active Clients"), and ability to "[c]reate favorable trading conditions."  In a portion of the Proposal dedicated to CLS Global's "Volume Support" services, the document distinguishes between "[s]upported and organic trading data," indicating that the NexFundAI team would be able separately to track "CLS Volume" (i.e., volume generated by CLS Global alone) and "External Volume" (i.e., volume generated by real investors) on CLS Global's "dashboard."  The Proposal included an

exemplar graphic showing those two categories of trading volumes, as well as a third category called "Total Volume":



60.     On July 31, 2024, a member of the NexFundAI team sent Zhorzhes an executed version of the "License Agreement."[5]  The executed agreement and an accompanying invoice required the NexFundAI team to pay CLS Global $4,000 per month in Tether for services including "Basic Trading Software," "Order Book Maintenance Software," and "Spread Maintenance Software."  The first of these, according to the agreement, involves "perform[ing] market trades allowing to grow the trading volume."

61.     The next day, August 1, 2024, Zhorzhes participated in another videoconference with the NexFundAI team.  At the outset of the videoconference, the NexFundAI team reiterated that it sought to "do some self-trading" on Uniswap "to create the appearance of, like, a user base . . . and some volume."  Zhorzhes underscored that CLS Global has "different tools" to "help with volume generation" and to "help create the FOMO," including creating "wallets" for trading.  Zhorzhes explained that CLS Global could "set up as many wallets as needed," and that creating "a thousand of wallets [sic] . . . to use for self-trade . . . that can be easily done, no problem."

---

[5]  The "License Agreement" identified the licensee—i.e., the entity to which CLS Global would provide "market making" services—as a Costa Rican entity.  However, both before and after sending the agreement to Zhorzhes, the NexFundAI team made clear to him that the NexFundAI team was U.S.-based.  In addition, the NexFundAI team told Zhorzhes that the signatory's purported Costa Rican location was a "dummy address."

62.     Zhorzhes again emphasized the importance of coordinating CLS Global's manipulative trading with the NexFundAI team's marketing and promotion efforts.  He noted that, if the NexFundAI team alerted CLS Global to upcoming announcements, CLS Global could modify its trading to create the appearance of "positive, you know, movement from the market" in response to the announcement, which Zhorzhes said would make people "more willing to invest into the token."

63.     Toward the end of the videoconference, Zhorzhes sought to confirm his understanding regarding NexFundAI's "tokenomics" (i.e., certain aspects of a crypto asset's design, including transaction fees imbedded into the smart contract).  A member of the NexFundAI team said that the information could be found on NexFundAI's website, a link to which had been sent to Zhorzhes.  Zhorzhes replied that he had seen the "tokenomics" on NexFundAI's website.

64.     Beginning on August 20, 2024, Zhorzhes and other CLS Global employees discussed, in a private Telegram chat with the NexFundAI team, the final steps necessary for CLS Global to begin trading NexFundAI.

65.     "Vlad | CLS," whom Zhorzhes said would "share the next steps" and prepare CLS Global's proposed "calculations" regarding trading volume and cost, stated that CLS Global would use 30 wallets for trading activity and estimated, based on parameters the NexFundAI team provided, that CLS Global could generate a 24-hour trading volume of $32,000.  "Vlad | CLS" also provided a list of 31 wallet addresses to be "whitelisted," meaning that CLS Global could trade NexFundAI using those addresses without incurring fees built into NexFundAI's smart contract (though CLS Global would still incur "gas" fees and Uniswap trading fees).  Those 31 addresses included the 30 that CLS Global intended to use for "market making" and

one address to which the NexFundAI team would provide the initial resources (ether and NexFundAI tokens) that CLS Global would use for trading.

66.     On August 22, 2024, "Maria | CLS" directed the NexFundAI team to provide ether and NexFundAI tokens for CLS Global's use.  After the NexFundAI team confirmed it had done so, "Maria | CLS" said:  "[W]e need about an hour to finalize the setup and distribute the funds across the deployed wallets.  We'll have the volume generation started tomorrow!"

**III.    CLS Global and Zhorzhes Engaged in Manipulative Trading.**

67.     On August 22, 2024, the NexFundAI team enabled trading of NexFundAI on Uniswap.[6]

68.     Between August 23 and September 18, 2024, CLS Global traded NexFundAI on Uniswap pursuant to its agreement with the NexFundAI team.  CLS Global's trades manipulated the market for NexFundAI by generating artificial trading volume for the purpose of inducing investors to purchase NexFundAI.

69.     During that period, the 30 addresses that CLS Global identified as those it intended to use for its manipulative trades executed 740 transactions in a NexFundAI and wETH liquidity pool on Uniswap.  Each transaction was subject to a "gas" fee.  Based on the daily closing price of ETH—the crypto asset that purchasers used to acquire NexFundAI from the Uniswap liquidity pool—CLS Global's trades generated an aggregate artificial trading volume of nearly $595,000 over the period in which CLS Global traded NexFundAI.

---

[6] Uniswap allows users interacting with "liquidity pools," which contain a specific pair of crypto assets, to "swap" (i.e. trade) one crypto asset in the pool for another.  The NexFundAI token was paired with "wrapped ether" (wETH), and to engage in trades, CLS Global needed a quantity of NexFundAI tokens (to trade for wETH) and a quantity of wETH (to trade for NexFundAI).  Wrapped ether is an ERC-20 token that represents ether.  Any user can make any new pair of crypto assets available for trading on Uniswap by calling the Uniswap liquidity pool contract.

70.     CLS Global's trades were roughly split between transactions in which NexFundAI was sold into the Uniswap liquidity pool (366 transactions, accounting for 49.9% of CLS Global's trading volume) and transactions in which NexFundAI was bought from the liquidity pool (374 transactions, accounting for 50.1% of CLS Global's trading volume).

71.     During the time in which CLS Global was actively trading NexFundAI, its trades accounted for just under 90% of NexFundAI transactions (740 of the total 827 transactions in that period) and 98% of the trading volume (nearly $595,000 out of the nearly $605,000 total).

72.     On August 30, 2024, "Maria | CLS" provided a "volume report" indicating that CLS Global's "generated volume" as of that date was "210,123 USD," and that "[o]rganic volume" as of that date was "7,738 USD."  During a September 5, 2024 videoconference, Zhorzhes confirmed that "the total generated volume is the overall volume that is generated through the bot, right, so self-trading, buying and selling.  So it's not organic, it's not like users coming and buying the token."

73.     The purpose of CLS Global's trading activity was to generate artificial trading volume, falsely suggesting to the investing public that there were multiple parties interested in and actively trading NexFundAI.  By creating artificial trading volume, CLS Global intended ultimately to induce others to buy NexFundAI, and individuals or entities other than CLS Global appear to have purchased NexFundAI during the relevant period.

74.     On September 18, 2024, the NexFundAI team disabled trading of NexFundAI on Uniswap.

**FIRST CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Sections 17(a)(1) and (3) of the Securities Act)**

75.     Paragraphs 1 through 74 above are re-alleged and incorporated by reference as if fully set forth herein.

76.     At all relevant times, NexFundAI was offered and sold a security under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)].

77.     By reason of the conduct described above, Defendants, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly, or negligently (i) employed devices, schemes, or artifices to defraud and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

78.     By reason of the conduct described above, Defendants violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §§ 77q(a)(1) and (3)] and will continue to violate those sections unless enjoined.

**SECOND CLAIM FOR RELIEF**
**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**(Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c))**

79.     Paragraphs 1 through 74 above are re-alleged and incorporated by reference as if fully set forth herein.

80.     At all relevant times, NexFundAI was offered and sold as a security under Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

81.     By reason of the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of

interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly, or recklessly (i) employed devices, schemes, or artifices to defraud and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

82.     By reason of the conduct described above, Defendants violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §§ 240.10b-5(a) and (c)] thereunder and will continue to violate those provisions unless enjoined.

**THIRD CLAIM FOR RELIEF**
**MARKET MANIPULATION**
**(Violations of Section 9(a)(2) of the Exchange Act)**

83.     Paragraphs 1 through 74 above are re-alleged and incorporated by reference as if fully set forth herein.

84.     At all relevant times, NexFundAI was offered and sold as a security under Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

85.     By reason of the conduct described above, Defendants, directly or indirectly, effected a series of transactions in a security not registered on a national securities exchange, creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

86.     By reason of the conduct described above, Defendants violated Exchange Act Section 9(a)(2) [15 U.S.C. § 78i(a)(2)] and will continue to violate that section unless enjoined.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

A.     Enter a permanent injunction restraining Defendants, their agents, servants, employees and attorneys, and those persons in active concert or participation with them who

receive actual notice of the injunction by personal service or otherwise, from violating Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)], and Sections 9(a)(2) and 10(b) of the Exchange Act [15 U.S.C. §§ 78i(a)(2) and 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)];

      B.      Order Defendants to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint pursuant to Sections 21(d)(5) and (7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5) and (7)];

      C.      Order Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

      D.      Enter an order prohibiting Defendants from participating, directly or indirectly, in any issuance, purchase, offer, or sale of any securities, provided, however, that such injunction shall not prevent Zhorzhes from purchasing or selling securities for his personal account;

      E.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

      F.      Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.

DATED:  October 9, 2024.

                        Respectfully submitted,

                        */s/ David J. D'Addio*
                        David J. D'Addio (Mass. Bar No. 665790)
                        Amy Harman Burkart (Mass. Bar No. 651828)
                        Ivan Panchenko (Mass. Bar No. 693552)
                        Colin Missett (Mass. Bar No. 706248)
                        Jeffrey Cook (Fla. Bar No. 647578)

SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch St., 24th Floor
Boston, MA 02110
Phone:  (617) 573-4526 (D'Addio direct)
Fax:  (617) 573-4590 (fax)
Daddiod@sec.gov (D'Addio email)